IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )      4:05 CR 3016
                               )
           v.                  )
                               )
                               )
BRIAN R. MOORE,                )   REPORT, RECOMMENDATION
                               )        AND ORDER
                               )
                Defendants     )


     Defendant has filed a motion to suppress evidence and
statements obtained as a result of a vehicle stop, his arrest,
and search of his vehicle on January 4, 2005.  Filing 27.  The
defendant claims the officers unlawfully stopped his vehicle in
violation of his Fourth Amendment rights; violated his Fifth
Amendment rights by conducting custodial interrogation without
providing <u>Miranda</u> rights; and as a result of these violations, he
was unlawfully arrested and all statements and evidence obtained
as a result of this unlawful arrest must be suppressed as fruit
of the poisonous tree.  An evidentiary hearing on this motion was
held before me on August 1 and August 5, 2005.  The defendant
submitted a pre-hearing brief in support of his motion; no brief
was filed by the government.  The matter is fully submitted.


     As more fully explained hereafter, I conclude the
defendant's Fourth Amendment claims should be denied; his Fifth
Amendment claims should be granted in part; and his claim for
suppression of evidence derived from his allegedly unlawful
arrest should be denied.

**FACTUAL FINDINGS**

On January 3, 2005 Sergeant Doggett of the Nebraska State Patrol ("NSP") received a call from the Los Angeles County, California Sheriff's Department regarding a United Parcel Service ("UPS") package addressed to a Lincoln, Nebraska residence on West Fairfield street.  The Los Angeles County Sheriff's Department stated the package had been intercepted in Los Angeles and found to contain drugs, and it further determined that packages had been sent from the Lakewood, California area to the West Fairfield address on two previous occasions.  Sergeant Doggett promptly relayed this information to NSP Sergeant Elwell.

The case was assigned to NSP investigator Brodecky working under the supervision of Sergeant Elwell. During the afternoon of January 4, 2005, Sergeant Elwell organized and coordinated the "controlled delivery" of the UPS package to the West Fairfield address, while Investigator Brodecky secured an anticipatory warrant to search the West Fairfield residence once the package was delivered.

Based on a background check performed by NSP, Sergeant Elwell knew a Caucasian female named Jenny Turechek ("Turechek") lived at the West Fairfield residence, and that Gale Wright ("Wright") was her boyfriend.  Sergeant Elwell therefore suspected either Turechek or Wright, or both, were involved in receiving UPS packages from California which contained illegal drugs.  The criminal investigation on January 4, 2005 did not, however, evolve as the officers anticipated.

Beginning at approximately 1:20 p.m. on January 4, 2005, NSP Investigators Richard Aldag and David Hanselmann began mobile

2

surveillance of the West Fairfield residence in preparation for
the controlled delivery of the intercepted package. Wright had a
criminal record indicating he may be violent. Therefore, advance
mobile surveillance of the West Fairfield residence was conducted
to assist in determining who was present at the location and to
assess any risks posed to law enforcement officers when they
delivered the package and executed the search warrant.

The West Fairfield residence was a trailer home located in a
mobile home park. A two-way street located on the south side of
the park provided the ingress and egress route to the mobile home
park. After entering the park through this south-side entry, the
road circled one-way counterclockwise through the park. Trailers
were parked on both sides of this road and in cul-de-sacs along
the road. After completing the roadway loop within the park, the
road returned to the point of entry and motorists could exit to
the south from the park. See exhibit 1. In addition, an access
road was located on the north side of the park, but this road was
not plotted on the map of Lincoln entered into evidence.

To avoid being identified or raising suspicion,
Investigators Aldag and Hanselmann conducted their surveillance
by driving through the mobile home park with alternating vehicles
and briefly parking at various locations to observe what
transpired at the West Fairfield location. This surveillance
method continued throughout the afternoon of January 4, 2005, and
until the package was delivered at approximately 4:33 p.m. As
the surveillance was conducted, Investigators Aldag and
Hanselmann reported their observations and findings to Sergeant
Elwell.

When the officers began their surveillance, they noticed
four vehicles parked near the West Fairfield residence:  a tan
Dodge Spirit, a brown Olds Delta 88, and a brown Mazda were
parked on a cement slab across the street; and a blue Lincoln was
idling on the street in front of the residence.  Investigators
Aldag and Hanselmann retrieved the license plate numbers from
these four vehicles and called those numbers into dispatch.
Dispatch advised that the Mazda and the Olds Delta 88 were
registered to occupants of residences within the West Fairfield
mobile home park; the Dodge Spirit was registered to Wright, and
the blue Lincoln was registered to the defendant, Brian Moore
("Moore").

Investigators Aldag and Hanselmann conveyed this information
to Sergeant Elwell, who ran criminal history checks on Wright and
Moore.  Wright reportedly had an extensive criminal history which
included violent behavior and convictions for robbery and
carrying a concealed weapon, and he was known to be a member of
an Omaha gang.  Moore had a drug-related felony conviction, had
been found with crack on his person during previous contacts with
law enforcement, and was suspected of illegal gun running between
Lincoln and California.  Based on these criminal history reports,
and the serious safety risks posed, Sergeant Elwell requested the
assistance of a SWAT team when the controlled delivery and search
were conducted.

Throughout the course of their continued surveillance,
Investigators Aldag and Hanselmann noted that the blue Lincoln
was repeatedly arriving at and leaving the location of the West
Fairfield residence.  At approximately 1:30 p.m., the officers
saw a black male scraping ice and snow from the windshield of the
Olds Delta 88.  The Olds Delta 88 then backed out of the parking

4

location and drove down the street, and the blue Lincoln pulled
into the parking area previously occupied by the Olds Delta 88.
Investigators Aldag and Hanselmann did not see the blue Lincoln
leave the West Fairfield area, but did see it return to the area
at approximately 2:00 p.m.  The officers observed the driver and
believed he was the same person who had previously scraped the
Olds Delta 88 windshield.  However, both Wright and Moore are
black, and based on their limited observations, the officers
could not discern who was driving the blue Lincoln.  The blue
Lincoln left the area at 2:14 p.m.  Investigators Aldag and
Hanselmann next saw the blue Lincoln in the vicinity at 3:15
p.m., and it left the area at 3:25 p.m.  It was later seen parked
in the driveway of the West Fairfield residence at 4:15 p.m., and
it left again at approximately 4:25 p.m.

    The movements of the blue Lincoln were reported to Sergeant
Elwell as the events unfolded who, in turn, briefed officers
involved in the controlled delivery to watch for a blue Lincoln.
Sergeant Elwell suspected the driver of the blue Lincoln intended
to purchase illegal drugs.

    United States Postal Service Investigator Clayton Reeves,
posing as a UPS employee, delivered the intercepted package to
the West Fairfield residence at 4:33 p.m.  The ten-member SWAT
team was posted two blocks away awaiting the delivery but close
enough to provide an immediate response to any safety concerns.
Consistent with standard SWAT procedures, Investigator Bergman
was present in his unmarked vehicle to document the actions of
the SWAT team.  Investigators Aldag and Hanselmann, now in
separate vehicles, were posted on a vacant trailer slab east of
the West Fairfield residence between Darkwood and Ebony (see

exhibit 1) and could see any traffic that approached from the east.

Sergeant Elwell observed the controlled delivery.  He noted that the woman who accepted delivery was black, not white.  He therefore knew Turechek, who occupied the residence, had not accepted delivery of the package.

Once Investigator Reeves left, the SWAT team parked in front of the residence, served the warrant, and entered the residence to investigate and assure it was safe to begin the search.  After the SWAT team issued an "all clear" for the residence, Sergeant Elwell and Investigator Brodecky entered the West Fairfield mobile home and began speaking with the black female.  She identified herself, both verbally and by driver's license, as Phylandria Watford ("Watford"), the co-defendant in this case.

Sergeant Elwell questioned Watford to determine why she was in Turechek's residence.  Watford stated she knew the residence was occupied by "Jenny," and claimed she had permission to be there, but Watford did not know Jenny's last name, where she was, where she worked, or what she drove.  Watford was arrested on an outstanding warrant.

While Sergeant Elwell was speaking with Watford, it occurred to him that the driver of the blue Lincoln remained at large, could still arrive at the scene, and may pose a danger.  Sergeant Elwell stepped out of the mobile home to speak with Captain Fisher and Lieutenant Stanczyk.  Sergeant Todd Kinghorn, the SWAT team leader, was also present.  Sergeant Elwell asked the SWAT team to remain at the scene to secure the perimeter and stop the

6

blue Lincoln if it arrived.  Sergeant Elwell then returned to the
trailer to speak with Watford.

     As Lieutenant Funkhauser, who also assisted in the
investigation and controlled delivery, was leaving the mobile
home park at approximately 4:45 p.m., he saw the blue Lincoln
entering the park.  Lieutenant Funkhauser notified Investigator
Aldag and apprised him that the blue Lincoln was approaching.
Investigator Aldag watched for the vehicle, confirmed that its
license plate number matched the blue Lincoln previously seen
near the West Fairfield address, and advised the SWAT team to
stop the vehicle.

     The ten SWAT team members, with handguns and automatic
weapons aimed at the vehicle and wearing black battle dress
uniforms and tactical vests identifying them as "Police," exited
their van, fanned out in a semi-circle on the roadway, and
motioned and commanded the blue Lincoln to stop.  Instead of
immediately braking to stop, the driver attempted to accelerate,
but since the street was snow-packed and covered with a dusting
of fresh snow, the vehicle spun its wheels.  The blue Lincoln
ultimately stopped in the middle of the street in front of the
West Fairfield residence and within a few feet of striking a SWAT
team member who had slipped on the ice and fallen to the ground.
The driver, later identified as defendant Moore, was removed from
the vehicle, positioned on his stomach in a yard on the south
side of the street, and handcuffed.

     Sergeant Elwell had begun to advise Watford of her Miranda
rights, but stopped when he heard the commotion of stopping the
blue Lincoln.  When he realized the blue Lincoln had arrived, he
asked Watford if she knew who was driving the blue Lincoln.  Her

demeanor changed immediately.  She stated she did not know who was driving the blue Lincoln, did not want to talk about it, and though she was willing to speak with the police, wanted an attorney present.

Investigator Aldag advised Sergeant Elwell that the blue Lincoln was the same vehicle seen in the area earlier, and the driver had been identified as Brian Moore.  Sergeant Elwell told Investigator Aldag to detain Moore so that the officers could determine why he was in the area and what involvement he may have with the package delivered to the West Fairfield residence. Investigator Aldag placed Moore with Lieutenant Stanczyk in that officer's marked pickup.

Approximately ten minutes later Investigator Aldag went to Lieutenant Stanczyk's pickup and identified himself to Moore.  He advised Moore that a search warrant had been served on the West Fairfield residence and that Moore's vehicle was previously seen in the area.  Investigator Aldag asked Moore if he had been driving the blue Lincoln all day.  Moore said he had. Investigator Aldag asked Moore to explain why he was driving in this area.  Moore responded that he had come to see his friend Jenny.

Investigator Aldag went to the West Fairfield mobile home and advised Sergeant Elwell of Moore's statements.  Sergeant Elwell told Investigator Aldag that "Jenny" was not present in the home and that the current occupant was Phylandria Watford. Sergeant Elwell instructed Investigator Aldag to detain Moore while the investigation continued.

8

At 4:57 p.m., while Investigator Aldag was speaking with Sergeant Elwell in the mobile home, Investigator Bergman saw a black male walking on the sidewalk and approaching the West Fairfield residence.  Investigator Bergman exited his vehicle to intercept the black male, who identified himself as Wright.  When Investigator Aldag left the mobile home, he saw Wright speaking with Investigator Bergman and another officer on the sidewalk. The three officers handcuffed Wright and escorted him to speak with Sergeant Elwell in the mobile home.

In response to Sergeant Elwell's questioning, Wright stated he was living with Turechek in the West Fairfield residence, and he did not know Watford or have any idea why she was there. Wright stated he knew Brian Moore, but he denied having any knowledge about the package or why it was delivered to Turechek's residence.

While Sergeant Elwell was questioning Wright, Investigator Aldag returned to Lieutenant Stanczyk's marked pickup and moved Moore from that vehicle to the front seat of Investigator Bergman's unmarked vehicle.  Moore's handcuffs were removed, and he was told "we're going to hang on to you until we can get this all figured out, what's going on here."  Since Moore had previously said he was there to see "Jenny," but only Watford was present in the mobile home, Investigator Aldag again asked Moore to identify who he was there to see.  Moore responded, "Jenny." Investigator Aldag asked Moore if the woman in the mobile home was Jenny.  Moore said, "No."  Investigator Aldag asked Moore to identify the woman in the mobile home.  Moore responded that he did not know her name, but he had dropped her off at that residence.

Investigator Aldag relayed this additional information to
Sergeant Elwell while Moore remained seated with Investigator
Bergman in his vehicle.  Investigator Bergman told Moore a
package of illegal drugs had been delivered to this residence and
explained why drug investigators and SWAT team members were
present.  Investigator Bergman questioned Moore concerning the
ownership of the blue Lincoln and Wright's identification.
Investigator Bergman asked Moore to explain what he was doing at
the West Fairfield residence, and Moore responded that he brought
women to this location to "get lucky."  Investigator Bergman
asked Moore if he done that before, and Moore admitted he had
been at this location a couple of times over the last two weeks.
Investigator Bergman asked Moore if he knew the owner of the
residence and if he had a key.  Moore stated he knew Turechek and
had a key to the residence.  Investigator Bergman and Moore
watched as Watford was escorted in handcuffs from the residence
for transport to jail.  Investigator Bergman asked Moore who she
was.  Moore stated he did not know her.  Moore asked whether she
was arrested on a warrant.  Investigator Bergman did not know at
the time and answered as such.

Shortly thereafter, at approximately 5:20 p.m., Turechek
arrived in her green pickup.  When Moore saw the pickup, he
identified it and stated Turechek was driving.  Investigator
Bergman passed this information on to the SWAT team.  When
Turechek saw the SWAT team members on the road, she put her
vehicle in reverse, but Investigator Bergman moved in behind
Turechek's vehicle and blocked her from leaving.

Turechek was handcuffed by officers and brought into her
residence to speak with Sergeant Elwell.  Her handcuffs were
removed, and in response to questioning, Turechek stated Wright

10

had permission to be there and had no involvement in the UPS package.  She stated she did not know who Watford was, and Watford did not have permission to be in her home.  Turechek further stated she had given Moore permission to use her address for receipt of a UPS package from California, and that she had done this on two prior occasions.

After speaking with Turechek, Sergeant Elwell concluded Moore was the person responsible for arranging for and receiving the UPS package.  He told Investigator Aldag to place Moore under arrest and allow Wright to leave.

Moore was arrested at approximately 5:45 p.m.  Investigator Aldag removed Moore from Investigator Bergman's cruiser, advised Moore that he was under arrest, and handcuffed him.  Investigator Aldag asked Moore if he was willing to speak to an investigator, and Moore stated that he was.  Moore was transported to jail by NSP Trooper Gutierrez.

Wright was placed in Investigator Bergman's vehicle, transported to a location at 33rd and P Streets in Lincoln, and released.

To avoid traffic congestion, the blue Lincoln was moved from the middle of the street (where it was stopped) to the shoulder of the street immediately west of the West Fairfield residence. The vehicle was searched, and the evidence secured during the search was turned over to Investigator Brodecky.

Between 7:00 p.m. and 8:00 p.m., Sergeant Elwell went to the jail to book Moore and Watford.  Sergeant Elwell asked Moore if he was willing to answer questions.  Moore would not consent to

questioning, and he was not questioned by Sergeant Elwell at the
jail.

## LEGAL ANALYSIS

Moore argues that the evidence and statements obtained from
him on January 4, 2005 must be suppressed because:  1) the
traffic stop of his vehicle, which resulted in the seizure
and search of his person, violated his Fourth Amendment rights;
2) law enforcement officers violated his Fifth Amendment rights
by conducting custodial interrogation without advising him of his
Miranda rights; and 3) all statements and evidence obtained from
Moore were direct results of Moore's illegal arrest and, thus,
must be suppressed as "fruit of the poisonous tree."

As to Moore's Fourth Amendment claim, the issue is whether
the January 4, 2005 traffic stop was a lawful investigative stop.
The Fourth Amendment permits police to make an investigative stop
of a vehicle if they have a "reasonable suspicion that the
vehicle or its occupants are involved in criminal activity."
United States v. Spotts, 275 F.3d 714, 718 (8th Cir.
2002)(quoting United States v. Bell, 183 F.3d 746, 749 (8th
Cir.1999).  Law enforcement officers are entitled to stop a
vehicle when they have a "particularized and objective basis" to
suspect the occupants are involved in or carrying out a criminal
activity.  Id.  Although Moore argues that no probable cause
existed to justify this vehicle stop, the standard supporting an
investigatory stop of a vehicle "is less demanding than the
standard of probable cause that governs arrests and full-scale
Fourth Amendment searches, both with respect to the amount of
supporting information that is required to establish reasonable
suspicion and with respect to the degree of reliability that the

12

information must exhibit." Id. (citing Alabama v. White, 496
U.S. 325, 330 (1990)).  The validity of an investigatory stop
"turns on the detailed facts of the case at hand.  We must
consider "the totality of circumstances--the whole picture." Id.
(quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

    Moore's vehicle was stopped after the search warrant had
been served at the West Fairfield residence.  Before stopping the
defendant's vehicle on January 4, 2005, law enforcement officers
knew Moore owned the blue Lincoln and that Moore had a criminal
record of illegal drug possession; the blue Lincoln had
repeatedly been seen driving to and temporarily parking near the
West Fairfield address during the afternoon of January 4, 2005,
the scheduled delivery date for the UPS package containing
illegal drugs; there had been two similar parcels sent recently
from the Lakewood, California area to this address; and the
"controlled delivery" of the package was accepted at Turechek's
West Fairfield residence by Watford, who did not live at the West
Fairfield address or know Turechek.

    "When a suspect approaches or seeks admission to a likely
drug house that is being searched, moderate evidence connecting
that person with the house has been held to support a Terry
stop." Id.  Upon considering the totality of the circumstances
presented, I conclude that the information gained through
surveillance of the West Fairfield residence, vehicle
registration records for the blue Lincoln, and Moore's criminal
history records, created a reasonable and articulable suspicion
that Moore, the driver of the blue Lincoln, was engaging in
illegal drug activity. Spotts, 275 F.3d at 719 (investigatory
stop of a truck that appeared a second time at a house where
police had previously witnessed at least one apparent drug sale

                            13

did not violate the Fourth Amendment).  Stopping the blue Lincoln
for further investigation did not violate the Fourth Amendment.

After Moore's vehicle was stopped, Moore was handcuffed,
placed in a patrol vehicle, and questioned by Investigator Aldag.
Moore claims is Fifth Amendment rights were violated because he
was not advised of his <u>Miranda</u> rights prior to this questioning.
The government argues that Moore was not under arrest, and
therefore not in custody when this questioning occurred.

"<u>Miranda</u> warnings are required only where there has been
such a restriction on a person's freedom as to render him 'in
custody.'  It was *that* sort of coercive environment to which
<u>Miranda</u> by its terms was made applicable, and to which it is
limited.'"  <u>United States v. LeBrun</u>, 363 F.3d 715, 720 (8th Cir.
2004)(quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)
(emphasis in original)).  "The ultimate inquiry to determine
custody for <u>Miranda</u> purposes is whether there was a formal
arrest, or restraint on freedom of movement of the degree
associated with a formal arrest."  <u>United States v. Black Bear</u>,
No. 04-3891 at 3-4 (8th Cir. Sept. 1, 2005); <u>United States v.</u>
<u>Czichray</u>, 378 F.3d 822, 828 (8th Cir. 2004).

There are two discrete inquiries essential to the "in
custody" determination.  The court must consider:  1) the
totality of the historical circumstances confronting the suspect;
and 2) given those circumstances, whether a reasonable persons
would consider their freedom of movement restricted to the degree
associated with a formal arrest.  <u>Black Bear</u>, No. 04-3891 at 4;
<u>LeBrun</u>, 363 F.3d at 720 (citing <u>Thompson v. Keohane</u>, 516 U.S. 99,
112 (1995)).  The Eighth Circuit has identified the following

14

factors for the court's consideration in determining whether a suspect was "in custody:"

> (1) whether the suspect was informed that he or she was free to leave or was not under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
>
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;
>
> (4) whether police used strong-arm tactics or deceptive strategies during questioning;
>
> (5) whether the atmosphere of the questioning was police-dominated; and
>
> (6) whether the suspect was arrested at the end of the questioning.

United States v. Galceran, 301 F.3d 927, 929-930 (8th Cir. 2002). See also Black Bear, No. 04-3891 at 6. This list is not exhaustive, and no one factor is necessarily dispositive. Galceran, 301 F.3d at 930. Rather, the court must look at the totality of the circumstances of the encounter, keeping mindful that the determination is based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." LeBrun, 363 F.3d at 720 (quoting Stansbury v. California, 511 U.S. 318, 322-23 (1994)). See also Black Bear, No. 04-3891 at 6.

The circumstances presented in this case began when ten SWAT team officers dressed in black battle dress uniform blocked West Fairfield Street and aimed their weapons at Moore's vehicle. After the vehicle stopped, Moore was taken out of the vehicle,

positioned prone on the ground, handcuffed, and placed in a
patrol vehicle.  Moore was not advised of his Miranda rights,
told he could refuse to answer the officers' questions, or
advised as to whether he was under arrest.  He was clearly not
free to leave.

"[A] reasonable person finding himself placed in handcuffs
by the police would ordinarily conclude that his detention would
not necessarily be temporary or brief and that his movements were
now totally under the control of the police--in other words, that
he was restrained to a degree normally associated with formal
arrest and, therefore, in custody." United States v. Newton, 369
F.3d 659, 676 (2d Cir. 2003).  Even absent a formal arrest, a
suspect surrounded by police officers, handcuffed, and detained
is in police custody for purposes of Miranda.  New York v.
Quarles, 467 U.S. 649 (1984).  See also, United States v Smith, 3
F.3d 1088 (7th Cir. 1993)(defendant in narcotics prosecution was
in custody when prior to questioning, he was frisked, placed in
handcuffs, and told to sit at specific place by the side of road,
police on scene outnumbered defendants, and defendant was clearly
not free to go anywhere); United States v. Henley, 984 F.2d 1040,
1042 (9th Cir. 1993)(suspect who had not been formally arrested
but was handcuffed and placed in the back of a police car was in
custody for Miranda purposes).  Compare, Black Bear, No. 04-3891
at 6 (though the defendant was questioned in a closed police
interview room, the defendant was not in custody because was not
handcuffed or restrained, was informed that he was not under
arrest, would not be arrested at the end of the interview, did
not have to speak with the officer, and could end the interview
at any time, and he voluntarily acquiesced to providing
responses); LeBrun, 363 F.3d at 720 (defendant was not in custody
where he was never physically restrained or handcuffed, was told

16

before his interview began that he was free to leave, understood he could terminate the interview and leave at any time, and had a cellular phone that allowed him access to others if he so chose).

Based on the totality of evidence before me, I conclude that while seated in the patrol vehicle in handcuffs, Moore was restrained to a degree normally associated with formal arrest and in custody for the purpose of <u>Miranda</u>.  A reasonable person in Moore's position would not believe he was free to terminate any interrogation and leave.

This finding does not, however, end the Fifth Amendment inquiry in this case because the defendant has moved to suppress all statements made to officers.  "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." <u>Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cty</u>., 124 S.Ct. 2451, 2460 (2004).  "Interrogation," as conceptualized in the <u>Miranda</u> opinion, "must reflect a measure of compulsion above and beyond that inherent in custody itself." <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980).  Interrogation includes not only express questioning by the officer, but also any words or actions which "police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Holman v. Kemna</u>, 212 F.3d 413, 417 (8th Cir. 2000)(citing <u>Innis</u>, 446 U.S. at 301).  In deciding whether particular police conduct is interrogation, the court must be mindful that the purpose of <u>Miranda</u> is to prevent "government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." <u>Arizona v. Mauro</u>, 481 U.S. 520, 529-30 (1987).

17

The first question asked of Moore was his identity. "Identity is, by definition, unique; yet it is, in another sense, a universal characteristic.  Answering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances."  <u>Hiibel</u>, 124 S.Ct. at 2461.  While "a case may arise where there is a substantial allegation that furnishing identity at the time of a stop would have given the police a link in the chain of evidence needed to convict the individual," there is no such allegation in this case.  Though Moore was in custody, the officers did not "interrogate" Moore and "elicit testimonial, incriminating, and compelled" information when they sought and obtained his identification.

While Moore sat handcuffed in Lieutenant Stanczyk's pickup, Investigator Aldag asked Moore if he had been driving the blue Lincoln all day and why he was driving in the West Fairfield area.  The West Fairfield residence was the site of a controlled delivery of illegal drugs which occurred less than a half hour before Moore was stopped and questioned.  The officers suspected the driver of the blue Lincoln was involved in the illegal drug activity associated with the package.

The ultimate and articulated purpose of Investigator Aldag's questions was to determine who was responsible for receiving the UPS package of illegal drugs.  Investigator Aldag's questions were directed at determining whether Moore was the previous driver of the vehicle, and therefore a suspect in an illegal drug activity, and whether he had any other innocent excuse for being in the area.  Considering the investigative purpose at the time of this encounter, asking such questions was interrogation

18

intended to elicit testimonial and incriminating information.
Moore's response to this inquiry should be suppressed.

Without advising Moore of his <u>Miranda</u> rights, Investigator
Aldag began to question Moore a second time.  This questioning
occurred approximately fifteen minutes after the stop.  Moore was
no longer in handcuffs, was seated in Investigator Bergman's
unmarked vehicle, and was told "we're going to hang on to you
until we can get this all figured out, what's going on here."
Removing the handcuffs and placing Moore in a different vehicle,
while advising him that he was not free to leave, did not convert
the Moore's prior custodial detention into an noncustodial
encounter.  A reasonable person in Moore's position would
continue to believe he was in custody.

Investigator Aldag's second round of questioning was aimed
at uncovering or explaining the discrepancies in Moore's prior
statements and his motives for being in the area.  Specifically,
Investigator Aldag asked Moore to identify who he came to see,
if he knew whether Turechek was in the residence, and whether he
knew Watford.  Questions aimed at determining whether a
connection existed between Moore and Watford, the recipient of a
controlled delivery of illegal drugs, or, in the alternative,
Moore and Turechek, who resided at the address of delivery, were
directly relevant to determining whether Moore was connected to
or responsible for the illegal drug activity under investigation.
The responses to Investigators Aldag's second series of questions
should also be suppressed.

Similarly, in the absence of <u>Miranda</u> warnings, Investigator
Bergman's questioning violated the Fifth Amendment.  Promptly
after Investigator Aldag's second series of questions, and while

Moore was still seated in Bergman's vehicle as officers "figured out" if Moore could be released, Investigator Bergman again asked Moore questions concerning the ownership of the blue Lincoln. Investigator Bergman also asked Moore to identity Wright and Watford, explain why Moore was in the West Fairfield area, state whether he had been there before, and state whether he knew Turechek and had a key to her residence.  This questioning was interrogation.  Moore's responses to these questions would likely lead to determining if Moore was connected to the drug-related crime under investigation.

However, while seated in the vehicle with Investigator Bergman, Moore initiated some conversation.  Moore asked whether Watford was arrested on a warrant, and he identified Turechek and her vehicle.  These comments and questions were voluntary statements and were not made in response to any questioning. Statements voluntarily made by a defendant while in custody are not protected by the Fifth Amendment or the exclusionary principles of Miranda.  Butzin v. Wood, 886 F.2d 1016, 1018 (8th Cir. 1989)(quoting United States v. Rhodes, 779 F.2d 1019, 1032 (4th Cir. 1985).

The defendant's final argument is that his arrest was based on illegally obtained evidence, and therefore evidence and statements obtained as a result of that unlawful arrest must be suppressed.  The traffic stop of Moore's vehicle did not violate the Fourth Amendment, and while Fifth Amendment violations did occur, Moore's arrest was fully supported by evidence wholly independent of Moore's responses to custodial interrogation. Simply stated, Miranda violations occurred, but Moore's arrest was not a fruit of those violations.

20

Moore's arrest was based on the officers' knowledge that the January 4, 2005 controlled delivery was the third such UPS package delivered to the West Fairfield address; the officers' observations of Moore's vehicle frequenting the neighborhood on January 4, 2005 as if waiting for a package to arrive; Watford's acceptance of the package followed by her change of demeanor when asked if she knew the driver of the blue Lincoln; and Turechek's statement that Moore was the intended recipient of the package, and that she had also permitted him to receive packages at this address on two prior occasions.  Although <u>Miranda</u> violations occurred in this case, even where some evidence is unlawfully obtained, the independent source doctrine allows officers to rely on and use evidence discovered by other lawful means in investigating crimes and pursuing criminal convictions.  <u>Nix v. Williams</u>, 467 U.S. 431, 443 (1984).

Moore's arrest was based on evidence obtained from sources wholly independent of any custodial interrogation conducted in violation of Moore's <u>Miranda</u> rights.  This independent evidence provided ample probable cause to arrest Moore.  Evidence and statements obtained as a result of that lawful arrest, including any evidence discovered during the search of Moore's vehicle following the arrest, should not be suppressed.

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, Chief United States District Judge, pursuant to 28 U.S.C. §636(b)(1)(B), that the Fourth Amendment claims raised in defendant's motion to suppress, filing 27, be denied, and that as to defendant's statements, the Fifth Amendment claims be denied in part and granted in part as set forth herein.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT FURTHER HEREBY IS ORDERED:  Trial is set for 9:00 a.m. on November 7, 2005 for a duration of three trial days before the Honorable Richard G. Kopf. Jury selection will be at the commencement of trial.

DATED this 1st day of September, 2005.

BY THE COURT:

s/ *David L. Piester*

David L. Piester
United States Magistrate Judge